**FILED**

March 05, 2026

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS

BY: _____ pg
DEPUTY

**UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

| | | |
|---|---|---|
| YITING LIU,<br><br>        Plaintiff,<br><br>vs.<br><br>TEXAS HEALTH AND HUMAN<br>SERVICES COMMISSION,<br><br><br>        Defendants.<br>_____ | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | CASE NO: <u>1-25-cv-1410</u><br><br><br><br>**VERIFIED COMPLAINT**<br><br><br><br>**TRIAL BY JURY DEMANDED** |

<u>**SECOND AMENDED COMPLAINT**</u>

TO THE HONORABLE UNITED STATES DISTRICT COURT JUDGE:

COMES NOW, Plaintiff Yiting Liu ("Plaintiff"), through her undersigned counsel, and files this Complaint and states:

<u>**NATURE OF THIS ACTION**</u>

1. Plaintiff files this Complaint and complains of hostile work environment and discrimination based on Race, Color, National Origin, Sex, and Retaliation.

2. This action seeks compensatory damages, emotional distress and mental anguish damages, and attorneys' fees.

<u>**PARTIES**</u>

3. Plaintiff, Yiting Liu, is a resident of Austin, Texas.

4. Defendant, Texas Health and Human Services Commission (hereafter "HHSC" or "Defendant"), is a Texas state government agency with its headquarters in Austin, TX, Travis County.

## VENUE

5. Venue is appropriate in the United States District Court for the Western District of Texas in that the Defendant, HHSC, is headquartered in this district, and a substantial part of the events or omissions giving rise to the claim occurred in this district, as required under 28 U.S.C. § 1391.

## JURISDICTION

6. The Court has original jurisdiction of this action pursuant to 28 U.S.C. §1331, as it involves federal question jurisdiction.

7. The unlawful employment practices were committed within the jurisdiction of this Court.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

8. Plaintiff has met all conditions precedent to the filing of this action. Plaintiff filed her Charge of Discrimination with the EEOC on January 19, 2024. The EEOC investigated the charge and issued a Notice of Right to Sue Letter on June 5, 2025. Plaintiff files this lawsuit no more than 90 days after receiving the Notice of Right to Sue Letter. *See* **Exhibit A.** This lawsuit has been filed within the statute of limitations as required under 42 U.S.C. §2000e.

## FACTS

**A. BACKGROUND**

9. Plaintiff, who is of Chinese national origin and Asian race began working for Defendant in July 2021, bringing with her to this job over 20 years of experience working in information technology.

**i.        Liu's Job Experience and Qualification**

10. Prior to working for Defendant, Ms. Liu worked as a key lead architect creating enterprise architecture solutions, technology infrastructure and operations for multiple Texas state agencies since 2008.

11.  Scott Miller hired Ms. Liu as the Enterprise Architect in the Class Title known as Systems Analyst VI of the Chief Technology Office.

12. In this role, Ms. Liu led the Architecture Review Board in approving 100 plus solution architecture proposals yearly for data, application, infrastructure, and security solution by mitigating solution architecture proposal concerns with technical subject matter experts.

13. In this role, Ms. Liu, amongst other duties, provided guidance and led data architects and application architects on data design, built or acquired strategies for the developer, and implemented data analytics on data designs, master data management, data warehouse, data mart solutions for ensuring data quality, data integrity, data security, data accessibility, and meeting business compliance with state legislation.

14. In March 2022, Scott Miller stepped down as director of enterprise architecture and reassigned the Architecture Review Board (ARB) to Ms. Liu to lead.

**ii.       Liu's Non-selection to Director of Enterprise**

15. In May 2022, Ms. Liu began to apply to multiple positions at HHSC that presented promotion opportunities, but Ms. Liu was not selected for any.

16. First, in May 2022, Ms. Liu applied for the position of Director II - Director of Enterprise Architecture. However, HHSC closed the vacancy after Ms. Liu applied, and Ms. Liu never received an interview for the position.

17. In August 2022, Ms. Liu applied for the new position of Director IV - Director of Enterprise Architecture. The position would have been a promotion.

18. However, in or around October 2022, HHSC chose not to select Ms. Liu and instead chose Mr. Roy Olekangal ("Mr. Olekangal") despite Ms. Liu being more qualified for the Director IV - Director of Enterprise Architecture.

19. Mr. Olekangal is a South Asian male who was not born in China.

20. Chief Technology Officer, Mr. Wayne Vore, a white male made the ultimate decision to hire Mr. Olekangal.

21. Not only did the Chief Technology Officer, Wayne Vore, have a prior friendship-type relationship outside the context of the employment setting with Mr. Olekangal, Mr. Olekangal misrepresented his past experience to HHSC to obtain his position over Ms. Liu.

22. Ms. Liu made HHSC upper management and hiring management aware of the relationship between Wayne Vore and Mr. Olekangal; however, no action was taken. As such, Ms. Liu set this injustice aside and began to work with Mr. Olekangal as a subordinate to him.

23. In comparison to Ms. Liu, Mr. Olekangal had substantially less previous experience in Enterprise Architectural ("EA") Infrastructure as following: 1999 to 1999 non-EA work, 2000 to 2013 non-EA work, 2001 to 2001 non-EA work, 2002-2005 non-EA work, 2005 to 2008 (non-EA work), 2008-2011 non-EA work, 2011 to 2013 non-EA work but general management, 2013 to 2015 first Director position that had non-specific EA-related work but unclear what percentage of the job was EA and what was non-EA work, 2015-2016 (First EA position, nondirector position), 2016 to 2022 with SPETT Solutions (Second noted EA work, Director position), and May 31, 2022 to September 20, 2022 (Third noted EA work).

24. There are three main takeaways that are of importance: (1) 2016-2022 SPETT Solutions, Inc, the job Mr. Olekangal claimed from 2016 to 2022 (6 years) was Mr. Olekangal's personally owned company, where the address listed is Mr. Olekangal's personal residence that portrayed Mr. Olekangal having a Director position of EA, yet he had no direct contracts with the State of Texas and SPETT Solutions was created and represented to HHSC so Mr. Olekangal could self-proclaim the title of Director of EA.

25. However, (2) an open records request with the Employment Retirement System ("ERS") showed that Mr. Olekangal was not employed as a Director under SPETT Solutions Inc., as it states: "our records indicate that Roy Olekangal was a contractor employed through ConnectTel. His assignment at ERS started on 05/31/2020 and ended on 05/27/2022. His role was Enterprise Architect II. Description of duties attached."

26. Mr. Olekangal held an     EA position for 2 of those 6 years even though he claimed it was from 2016 to 2022.

27. Next, from 2016 to 2019, an Open Records with TxDOT for SPETT Solutions states: "The named resource/staff ("Olekangal") was an employee hired with a company named NTT Data under purchase order 601440000001210. It was a managed service contract (Enterprise Architect) team on the NTT Eagle contract, which was deactivated or deprovisioned from the TxDOT systems on 1/7/19. NTT Data: 3/14/2016 – 1/7/2019. We did not find any contracts with the vendor "SPETT" in any variations of the name. This is everything we have on your request."

28. This shows that not only did Mr. Olekangal fail to identify this major distinction to HHSC that he was a contractor during these 3 years, but it was for a position non-director position for EA contract work through NTT.

29. It is abundantly clear that Mr. Olekangal's prior experience, in his current HHSC Director EA position, is not reflective of the requisite 6 years of Director of EA experience.

30. Mr. Olekangal maintained his NTT contract with TxDOT at the same time he worked with Wayne Vore and Cassie Jordan, whom both were fired from TXDOT and subsequently hired with HHSC.

31. HHSC in 2020 hired Cassie Jordan and Wayne Vore. Mr. Vore hired Mr. Olekangal instead of Ms. Liu, despite Ms. Liu's superior experience due to Ms. Liu's sex, race, national origin, and color.

32. Mr. Olekangal was an Enterprise Architect through state contracts with NTT for 2 years and 10 months and with Connect Tel for 2 years.

33. This NTT-related experience and Connect Tel experience cumulatively of slightly over 4 years of directly applicable work is the only verifiable architecture work that Mr. Olekangal had.

34. Five (5) months of architecture experience in 2022 with McLane has not been verified to support his requisite working background.

35. The rest of Mr. Olekangal's experience is on managing application development or being a programmer, which is also not supportive of the requisite duties in this job.

36. The job interview for this position was conducted by former Chief Technology Officer Wayne Vore and former Director of Enterprise Architecture Scott Miller.

37. While Yiting Liu was also interviewed, Scott Miller was the one who provided Ms. Liu with the information about how he suspected Mr. Olekangal's inexperience and nonsupportive information about "SPETT" was questionable because Mr. Miller thought that Mr. Olekangal did not seem to have senior level technical expertise.

38.  However, through her time working under Mr. Olekangal, Ms. Liu spent much of her time having to teach Mr. Olekangal and knowledge transfer for Mr. Olekangal most of the day-to-day duties.

39. While Mr. Olekangal attempted to perform his role, from all appearances, he never took over responsibilities on ARB or technical standards.

40. Anytime Ms. Liu had questions or needed directions, Mr. Olekangal usually responded that Ms. Liu needed to ask CTO Wayne Vore. In all one-on-one meetings between Mr. Olekangal and Ms. Liu, Mr. Olekangal did not lead the meetings like an experienced manager and eventually cancelled the meetings altogether.

41. He never produced any work agendas and never had any concrete goals for Ms. Liu's position to fulfill. He was very hands off on Ms. Liu's position from a micro and macro level, such that it was clear he did not understand how Ms. Liu performed her job.

42. All of Ms. Liu's work assignments and priorities would come from CTO Wayne Vore and DCIO Cassie Jordan, which was further evidence that Mr. Olekangal had insufficient work experience to enable him to delegate and manage Ms. Liu's position.

### iii.    Liu's Non-selection to Systems Analyst

43. In March 2023, Ms. Liu applied for the Systems Analyst VII position, which also represented a promotion for herself.

44. However, HHSC again chose not to select her for the promotion as they closed the vacancy in May 2023 without interviewing Ms. Liu.

45. Ms. Liu learned in June of 2023 that HHSC had, without notice to Ms. Liu, removed the posted position, which removed Ms. Liu from consideration.

46. When HHSC reposted the position, Ms. Liu inadvertently noticed HHSC reposted the exact same job posting, which she found odd.

47. Ms. Liu asked if she should reapply, but she was advised by Mr. Olekangal to not apply, to not waste her time, and to discuss the reasons why with Mr. Vore

48. Instead, Jordan Davenport was selected. He is a younger, Caucasian male, born in America. Ms. Liu was also significantly more qualified for the position as compared to Mr. Davenport.

49. Ms. Liu was more qualified for this position than Mr. Davenport, as this System Analyst VII position required qualifications as a System Analyst VI, plus more experience with advanced computer analysis work and management/leadership.

50. Mr. Davenport's experience primarily falls within overseeing projects, high level strategies and programming. Upon review of his job application and resume, there is little experience in Technology enterprise architecture including technology roadmaps from As-Is to future technical architectures, technical implementation of solutions, highly advanced computer systems analysis work.

51. In comparison, Ms. Liu's experience includes performing Technology enterprise architecture including technology roadmaps from As-Is to future technical architectures, technical implementation of solutions, highly advanced computer systems analysis work since 2002 for a total of 22 years.

52. This job function requires working within and cross functional Texas state agencies on leading IT projects and implementing technology architecture solutions.

53. Mr. Davenport never had experience working in Texas state government technologies.

54. There is zero experience from Mr. Davenport in working on any cross Texas state agency technology architectural solutions.

55. Ms. Liu has had 25 years of IT experience working in Texas state agencies including Texas Comptroller of Public Accounts, Attorney General of Texas and Texas Health and Human Services, and cross functional state agency systems with Texas Department of Information Resources, Texas Workforce Commissions and Texas Secretary of State.

56. Ms. Liu's 25 years of experience in this field versus Mr. Davenport's 16 years of experience should have alone been enough to indicate Ms. Liu is the superior candidate.

57. In addition, Mr. Davenport is TOGAF Enterprise Architect Level I/Foundation certified, which is evidence of being lesser qualified in terms of experience to Ms. Liu's TOGAF Enterprise Architect Level II/Advanced certification.

### iv.      Liu Being Subjected to Harassment by Olekangal

58. Starting in July 2023, Roy Olekangal's work was put on hold by the Chief Technology Officer ("CTO") Wayne Vore, and without advanced explanation, Roy Olekangal and the new Systems Analyst VII, Jordan Davenport, began showing up in Ms. Liu's ARB-related team meetings.

59. Without being invited directly and without a clear role and responsibility for their presence, this caused a disruption for Ms. Liu. This had made it more difficult for her to manage the ARB meetings and outcomes.

60. While Ms. Liu did well in her role, according to Deputy Chief Information Officer ("DCIO") Cassie Jordan's new direction and had received compliments from various managers, Ms. Liu was not supported by Roy Olekangal, who was not honest with DCIO Cassie Jordan on his negativity of Ms. Jordan's leadership and new direction.

61. Around this time, CTO Wayne Vore did confirm in a team meeting that Ms. Liu was complying correctly and had proper direction from Cassie Jordan.

62. When Ms. Liu noticed that Roy Olekangal was not honest in front to Cassie Jordan about Ms. Liu's performance and projects, it caused Ms. Liu to question Roy Olekangal's integrity over the hiring and selecting of the Systems Analyst VII (Mr. Davenport) from March 2023 to June 2023.

**v.      Protected Activity Complaint**

63. On or about September 20, 2023, Ms. Liu verbally voiced her concerns of discrimination to Mr. Olekangal regarding the non-selection for Systems Analyst VII during a one-on-one meeting.

64. On September 20, 2023, Ms. Liu complained to Mr. Olekangal by stating, "It is unfair and unequal employment practice that I was not selected for positions that I am qualified for." She also stated, "Can you tell me why you told me not to apply for the same job positing?" Lastly, she stated, "This can be a violation of Equal Employment Opportunities laws." And also stated, "I think that what you did could be illegal."

65. Mr. Olekangal refused to respond to Ms. Liu's complaint and stated "Talk to Wayne," so Ms. Liu then contacted Chief Technology Officer Wayne Vore ("Mr. Vore") and Deputy Chief Information Officer Cassie Jordan ("Ms. Jordan") to voice her same complaints surrounding disparate treatment based on race, sex, color, and national origin.

66. On or about September 21, 2023, Mr. Olekangal emailed Ms. Jordan and Mr. Vore requesting to remove Ms. Liu from Mr. Olekangal's team and to create 'new work rules' to apply only to Ms. Liu in an effort to micromanage her. Both requests were subsequently granted.

67. Afterward, Mr. Olekangal refused to meet with Ms. Liu in one-on-one meetings and resorted to internal messages and emails.

**vi.      Liu Subjected to Adverse Personnel Action**

68. On October 4, 2023, Mr. Olekangal issued Ms. Liu a performance improvement plan ("PIP") filled with erroneous, false allegations of performance issues.

69. Mr. Olekangal enforced specifically created rules that Ms. Liu would have to follow, but no other employees, including Matthew Alexander, Enterprise Architect/Systems Analyst VI; Jordan Davenport, Enterprise Architect/Systems Analyst VII, who performed similar duties and supervised by Olekangal, were required to follow them.

70. Those work rules would be requirements to be physically on site, starting at a particular time, start and stopping the meetings on time, and providing an agenda to the meetings in advance.

71. The work rules created for Ms. Liu were discouraged by Mr. Olekangel's supervisor, Cassie Jordan, as she was unsure of how these made-up rules were proportional and proper to any allegations of wrongdoing.

72. Ms. Jordan stated, "I think it would be helpful to meet with HR and discuss how to line out the performance expectation like your #2. I don't think all of those are performance expectations, but they can help you put those together. I would also talk to them about the approach you should take – is this a PIP or something else."

73. Ms. Jordan goes on to say, "Everything should be defensible."

74. Mr. Olekangal responded to Ms. Jordan stating: "I hate doing this since I don't have to create a set of work rules for anyone else on the team, but it is what is it."

**vii.    Liu Makes Protected Activity Complaint**

75. In response that same day on October 4, 2023, Ms. Liu filed an internal complaint with Civil Rights Office at HHSC against Mr. Olekangal regarding the PIP.

76. The issues listed in her HHSC complaint described how the allegations supporting the PIP predated Ms. Liu's June 29, 2023 Annual Evaluation and her August 2022 evaluation, which did not reflect any of these allegations against her.

77. Upon review of the PIP, Ms. Liu quickly realized that there were vague, ambiguous, and subjective issues that Mr. Olekangal was trying to point to in order to find that Ms. Liu incorrectly performed her job.

78. Yet, no clear violations of any policy were asserted, thus making the PIP unworkable and impossible to satisfy.

79. Ms. Liu then filed her first EEOC Charge of Discrimination on October 7, 2023, complaining about the discrimination surrounding the non-selection of the Enterprise Architecture and Systems Analyst VII positions and the retaliatory performance improvement plan and counseling regarding allegations of violating work rules that were not HHSC-based rules.

80. After issuing the PIP, Mr. Olekangal refused to listen to Ms. Liu's explanation and objections to the PIP and refused to meet with Ms. Liu to discuss the status of work assignments.

81. Also, during this time on October 23, 2023, HHSC terminated DCIO Cassie Jordan.

82. Ms. Liu never indicated to Mr. Olekangel that she was unwilling to meet with him except for two meetings that pertained to her PIP and her termination, where she had requested an agenda in advance, as this was their past practice.

83. Ms. Liu requested agenda for the October 12th and 18th meeting, in advance, so she could prepare for the meetings.

84. After the two missed meetings for October 12th and 18th, Mr. Olekangal cancelled all further meetings starting November 2023 until Ms. Liu's termination, including a February 13, 2024 meeting that Ms. Liu specifically indicated she was unable to attend due to a previous work-related meeting conflict.

85. Ms. Liu also offered a different time to meet, but Mr. Olekangal and Mr. Pacian Heath, the interim CTO at the time, met without Ms. Liu.

**viii.** **Liu Subjected to Adverse Personnel Action**

86. On November 3, 2023, Mr. Heath issued to Ms. Liu a management counseling meeting without prior warning to her to put supplemental additional untrue allegations against Ms. Liu for the PIP; yet, he refused to discuss any of Ms. Liu's issues with the PIP.

87. Both Mr. Heath and Mr. Olekangal refused to mediate or discuss Ms. Liu's complaints of discrimination and retaliation.

88. The interim CTO Mr. Heath issued this admonishment or counseling regarding Ms. Liu's performance without ever have addressed the issues in advance its issuance.

**ix.** **Liu Makes Protected Activity Complaint**

89. On November 5, 2023, Ms. Liu filed an additional complainant with HHSC Civil Rights Office to complain about the further issues with the PIP.

90. Mr. Olekangal issued Ms. Liu an additional notice of poor performance on November 6, 2023.

91. The allegations in the counseling document issued to Ms. Liu claimed further "Work Rule Violations" in furtherance of the PIP, and he maintained Ms. Liu was still not in compliance with the PIP.

**x.      Liu Subjected to Further Harassment**

92. After the second complaint in November 2023 through February 2024, Ms. Liu continued to receive false allegations against her regarding alleged performance issues and noncompliance with her PIP.

93. Ms. Liu requested multiple times to meet with Mr. Olekangal to address these alleged performance issues, but Mr. Olekangal denied each request.

94. Ms. Liu also requested during this same time to meet with Mr. Heath on four occasions to discuss her status reports that she had with Ms. Jordan before Ms. Jordan's departure.

95. Ms. Liu interviewed in January 2024 for CTO, but without knowledge to Ms. Liu, the position was removed by HHSC. This would make three times that Ms. Liu, an extremely qualified candidate, was removed from consideration.

96. Mr. Heath did eventually meet with Ms. Liu on October 11, 2023, November 2, 2023, December 15, 2023, and January 25, 2024, but he did not mention any issues with Ms. Liu's performance and only disclosed that Ms. Jordan had taken over the Chief Technology Officer to direct Mr. Vore, Mr. Heath, Mr. Olekangal and Ms. Liu prior to her departure from HHSC on October 23, 2023.

97. On January 19, 2024, Ms. Liu met with EEOC investigator and on that same date EEOC assisted Ms. Liu in filing her formal charge of discrimination.

**xi.    Liu Subjected to Adverse Personnel Action**

98. Ms. Liu informed HHSC about an EEOC charge being filed on January 19, 2024. Afterwards, on January 25th, Mr. Heath falsely claimed that Ms. Liu did not obtain his authorization to provide volunteer 'Access Eligibility Services (AES)' work while he apologized for not being transparent about answering Ms. Liu's AES volunteer request to do the AES work.

99. Ms. Liu was authorized by HHSC to perform AES volunteer work between December 2023 and January 19, 2024.

100.    Since January 19, 2024 was a state holiday when Ms. Liu volunteered, she volunteered with AES on her own time.

101.    Ms. Liu had notified Mr. Olekangal of her intent to volunteer with AES by notifying him through an Outlook calendar request on January 19, 2024, and Mr. Olekangal never denied her the ability to volunteer with AES.

102.    Mr. Heath was not Ms. Liu's supervisor and did not have authority over AES volunteer work.

103.    On or about February 9, 2024, Ms. Liu received an additional PIP with additional false allegations of performance issues, including allegations of failure to follow the work rules that were solely applied to Ms. Liu.

**xii.    Liu Submits Legally Protected Complaint with HHSC**

104.    Ms. Liu, that same day on February 9, 2024, reported the additional adverse actions to HHSC Civil Rights Office against Mr. Olekangal and Mr. Heath about the added allegations to the PIP issued to Ms. Liu.

**xiii.**    **Liu Terminated from HHSC**

105.    On February 13, 2024, HHSC terminated Ms. Liu.

106.    On March 6, 2024, April 29, 2024, and May 1, 2024, HHSC gave false information about Ms. Liu attending the AES volunteer opportunity as the basis for her termination to Texas Workforce Commission (TWC) to have Ms. Liu's unemployment payments denied.

107.    On April 24th, Mr. Heath was reverted back to his former and lower position prior to being named interim CTO. However, Mr. Heath misrepresented himself as CTO on April 29th, 2024, and in the May 1, 2024 TWC hearing and continued to provide false information about Ms. Liu's performance at HHSC.

108.    Ms. Liu updated her February 9, 2025 complaint with HHSC regarding her termination as retaliation for engaging in the preceding protected activities.

## COUNT I: DISCRIMINATION BASED ON NATIONAL ORIGIN UNDER 42 U.S.C. § 2000e, *et seq.*

109.    Plaintiff incorporates all information and allegations contained in the preceding paragraphs as if fully set forth herein.

110.    Title 42 U.S.C. §2000e, *inter alia*, protects employees from employment discrimination on the basis of national origin.

111.    To establish a prima facie case of national origin discrimination, a plaintiff must ordinarily demonstrate that "(1) [s]he is a member of a protected class, (2) [s]he was qualified for the position at issue, (3) [s]he was the subject of an adverse employment action, and (4) [s]he was treated less favorably because of his membership in that protected class than were other similarly situated employees who were not members of the protected class, under nearly identical circumstances. *Lee v. Kansas City Southern Ry. Co.*, 574 F.3d 253, 259 (5th Cir. 2009).

112.    Defendants, by and through their agents and employees, engaged in the aforementioned practices, policies, customs, and usages made unlawful by 42 U.S.C. §2000e, *et seq,* because of Plaintiff's protected status.

113.    Plaintiff was subjected to disparate-treatment discrimination because of her national origin and/or perceived national origin of being born in China and being Asian as compared to her the other employees, including Matthew Alexander, Enterprise Architect/Systems Analyst VI, and Jordan Davenport, Enterprise Architect/Systems Analyst VII, who performed similar duties and managed by the Defendant, who were similarly situated as Plaintiff and treated more favorably. *See* Cicalese v. Uni t. *See Pacheco v. Mineta*, 448 F.3d 783, 787 (5th Cir. 2006).

114.    Had Plaintiff not been Asian and/or Chinese and/or of Chinese heritage, Defendants would not have subjected Plaintiff to an adverse action of being issued a PIP, counselings, and failure to hire, also known as nonselections for the Director of the EA and Systems Analyst, and ultimately terminated.

115.    Other employees, including Matthew Alexander, Enterprise Architect/Systems Analyst VI, and Jordan Davenport, Enterprise Architect/Systems Analyst VII, who performed similar duties and supervised by Olekangal were not subjected to non-HHSC based work rules, unwarranted PIPs and counseling,  nor terminated under similar circumstances of Ms. Liu performing her day-to-day duties *See Cicalese v. University of Tex. Med. Branch*, 924 F.3d 762, 766-68 (5th Cir. 2019)

116.    Additionally, Ms. Liu was highly qualified in her field of Informational Technologies, and she had substantially more experience and better qualifications that the employees hired instead of her, including Mr. Olekangel and Mr. Davenport.

117.    As a direct and proximate result of the Defendants' conduct that violated 42 U.S.C. §2000e, *et seq*., Plaintiff suffered damages, including loss of a salary, emotional distress, and attorneys' fees and costs.

118.    Defendants' actions were intentional, willful, harsh, oppressive, reckless, and malicious, and as a further and proximate cause, Plaintiff has suffered severe emotional distress, pain, and suffering.  The wrongs done by the Defendants were aggravated by their willfulness, wantonness, and maliciousness..   Plaintiff, therefore, seeks compensatory damages in a sum to be determined by the trier of fact.

119.    Defendant is directly liable for the discriminatory acts or omissions of its agents, servants and employees while acting within the course and scope of their employment, under the theory of Respondeat Superior.

120.    Defendants' actions as stated above, and the resulting damages to Plaintiff, have necessitated that Plaintiff retain the services of TULLY RINCKEY, PLLC, to represent her in these proceedings.  Wherefore, Plaintiff seeks recovery of reasonable and necessary attorneys' fees.

## COUNT II: DISCRIMINATION BASED ON RACE UNDER 42 U.S.C. § 2000e, *et seq.*

121.    Plaintiff incorporates all information and allegations contained in the preceding paragraphs as if fully set forth herein.

122.    Plaintiff is a member of a protected class based on her Asian race.

123.    Because of her race, Plaintiff was subjected to discrimination.

124.    A plaintiff establishes a *prima facie* case of racial discrimination if she shows that: "1) she belongs to a protected group; 2) she was qualified for his position; 3) she suffered an adverse employment action; and 4) she was replaced by someone outside of her

protected group or a similarly situated employee outside of her protected group was treated more favorably. *Owens v. Circassia Pharms., Inc.*, 33 F.4th 814, 825 (5th Cir. 2022)

125.    Defendant knew that Plaintiff is Asian prior to subjecting her to disparate-treatment discrimination, including subjected Plaintiff to an adverse action of being issued a PIP, counselings, and failure to hire, also known as nonselections for the Director of the EA and Systems Analyst, and ultimately terminated. *See* Cicalese v. Uni t. *See Pacheco v. Mineta*, 448 F.3d 783, 787 (5th Cir. 2006).

126.    Ms. Liu was highly qualified in her field of Informational Technologies, and she had substantially more experience and better qualifications that the employees hired instead of her, including Mr. Olekangel and Mr. Davenport.

127.    Plaintiff's race was a determining factor in Defendant's unlawful conduct toward Plaintiff.

128.    The reasons proffered by Defendant for its unlawful conduct are pretextual and Defendant cannot further offer any legitimate reason for its unlawful conduct.

129.    Defendant's aforementioned conduct has been intentional, deliberate, willful, malicious, reckless, and in callous disregard of the rights of Plaintiff because of her race.

130.    Defendant discriminated against Plaintiff because of her race by engaging in, tolerating, or failing to prevent discrimination and by failing to take affirmative action to correct and redress the unlawful employment practices perpetrated against Plaintiff.

131.    As a direct and proximate cause of Defendant's conduct alleged throughout this Complaint, Plaintiff suffered and continues to suffer from harm, injury and monetary damages, and is entitled to all available legal and equitable remedies.

132.     Plaintiff was humiliated, embarrassed and made to endure a great amount of pain and suffering, and her injury is permanent in nature. Further, Defendant's treatment and actions were ongoing throughout the period stated in this complaint.

133.     Defendant is directly liable for the discriminatory acts or omissions of its agents, servants and employees while acting within the course and scope of their employment, under the theory of Respondeat Superior.

### COUNT III: DISCRIMINATION BASED ON COLOR

134.     Plaintiff incorporates all information and allegations contained in the preceding paragraphs as if fully set forth herein.

135.     Plaintiff is a member of a protected class based on her color of her skin.

136.     Because of her color, Plaintiff was subjected to discrimination.

137.     A plaintiff establishes a *prima facie* case of color discrimination if she shows that: "1) she belongs to a protected group; 2) she was qualified for his position; 3) she suffered an adverse employment action; and 4) she was replaced by someone outside of her protected group or a similarly situated employee outside of her protected group was treated more favorably. *Owens v. Circassia Pharms., Inc.*, 33 F.4th 814, 825 (5th Cir. 2022), *See, e.g.*, *Bryant v. Bell Atl. Md., Inc.*, 288 F.3d 124, 132 n.5 (4th Cir. 2002) ("Color discrimination arises when the particular hue of the plaintiff's skin is the cause of the discrimination, such as in the case where a dark-colored African-American individual is discriminated against in favor of a light-colored African-American individual."), *see Bailey v. United States*, 516 U.S. 137, 146 (1995) ("We assume that Congress used two terms because it intended each term to have a particular, nonsuperfluous meaning.").

138. Defendant knew that Plaintiff skin color prior to subjecting her to disparate-treatment discrimination, including subjected Plaintiff to an adverse action of being issued a PIP, counselings, and failure to hire, also known as nonselections for the Director of the EA and Systems Analyst, and ultimately terminated. *See* Cicalese v. Uni t. *See Pacheco v. Mineta*, 448 F.3d 783, 787 (5th Cir. 2006).

139. Ms. Liu was highly qualified in her field of Informational Technologies, and she had substantially more experience and better qualifications than the employees hired instead of her, including Mr. Olekangel and Mr. Davenport.

140. Plaintiff's color was a determining factor in Defendant's unlawful conduct toward Plaintiff.

141. The reasons proffered by Defendant for its unlawful conduct are pretextual and Defendant cannot offer any legitimate reason for its unlawful conduct.

142. Defendant's aforementioned conduct has been intentional, deliberate, willful, malicious, reckless, and in callous disregard of the rights of Plaintiff because of her color.

143. Defendant discriminated against Plaintiff because of her color by engaging in, tolerating, or failing to prevent discrimination and by failing to take affirmative action to correct and redress the unlawful employment practices perpetrated against Plaintiff.

144. As a direct and proximate cause of Defendant's conduct alleged throughout this Complaint, Plaintiff suffered and continues to suffer from harm, injury and monetary damages, and is entitled to all available legal and equitable remedies.

145. Plaintiff was humiliated, embarrassed and made to endure a great amount of pain and suffering, and her injury is permanent in nature. Further, Defendant's treatment and actions were ongoing throughout the period stated in this complaint.

146.    Defendant is directly liable for the discriminatory acts or omissions of its agents, servants and employees while acting within the course and scope of their employment, under the theory of Respondeat Superior.

### COUNT IV: DISCRIMINATION BASED ON SEX 42 U.S.C § 2000e-2(a)(1)
(*Female*)

147.    Plaintiff incorporates all information and allegations contained in the preceding paragraphs as if fully set forth herein.

148.    Defendant discriminated against Ms. Liu because of her sex in violation of Title VII, 42 U.S.C. § 2000e-(2)(a), by engaging in, tolerating or failing to prevent the sex-based discrimination alleged herein.

149.    The Defendant's improper adverse actions against Plaintiff included subjecting Plaintiff to an adverse action of being issued a PIP, counselings, and failure to hire, also known as nonselections for the Director of the EA and Systems Analyst, and ultimately terminated.

150.    The reasons proffered by Defendant for its unlawful conduct are pretextual, and Defendant cannot further offer any legitimate reason for its unlawful conduct. Other employees, who did not share Plaintiff's sex, were treated more favorably than Plaintiff in terms and conditions of employment.

151.    As a direct and proximate result of the aforementioned acts that violated the Title VII, Plaintiff has suffered loss of wages, both in the past, present, and future, as well as compensatory damages, including but not limited to emotional distress, lost wages, and attorneys' fees and costs.

152.    Defendant's aforementioned conduct has been intentional, deliberate, willful, malicious, reckless, and in callous disregard of the rights of Plaintiff because of his race.

153.    Defendant is directly liable for the discriminatory acts or omissions of its agents, servants and employees while acting within the course and scope of their employment, under the theory of Respondeat Superior.

154.    The wrongs done by the Defendants were aggravated by their willfulness, wantonness, and maliciousness for which the law allows the imposition of compensatory damages. Plaintiff, therefore, seeks compensatory damages in a sum to be determined by the trier of fact.

155.    Defendants' actions as stated above, and the resulting damages to Plaintiff, have necessitated that Plaintiff retain the services of Tully Rinckey PLLC, to represent him in these proceedings. Wherefore, Plaintiff seeks recovery of reasonable and necessary attorneys' fees.

156.    As a result of Defendant's actions, Ms. Liu has incurred lost wages and loss of career opportunity, now and into the future, without Ms. Liu contributing any negligence thereto.

## COUNT V: HOSTILE WORK ENVIRONMENT UNDER TITLE VII

157.    Plaintiff incorporates all information and allegations contained in the preceding paragraphs as if fully set forth herein.

158.    To state a claim for hostile-work-environment, Ms. Liu must allege (1) she belongs to a protected group; (2) she was subjected to unwelcome harassment; (3) the claimed harassment was based on the protected characteristic; (4) the claimed harassment affected a term, condition, or privilege of employment; and (5) the employer knew or should have

known of the harassment and failed to take prompt remedial action. *See Hernandez v. Yellow Transp., Inc.*, 670 F.3d 644, 651 (5th Cir. 2012).

159.     As a result of Plaintiff's protected status, Plaintiff's supervisor Mr. Olekangal openly admits to creating tailored rules to discipline Ms. Liu for actions that would normally not rise to the level of warranting discipline, issuing a PIP on October 4, 2023 and January 2023 that was unwarranted, vague and lacking obtainable requirements to complete when told "(1) Yiting will be expected to work autonomously for her tasks with sometimes minimal to not guidance. (2) Yiting should not bring unrelated topics into discussion and create confusion. (3) Yiting should follow the previously created rules on whether ARB is required or not and follow them. (4) Yiting should be cordial with other HHSC IT staff and not force them to attend meetings if they are not prepared. (5) Yiting cannot talk with anyone else about any work assignment/direction changes to the CTO EA team and convey that her manager and/or anyone else on the CTO EA team. (6) Yiting should be cordial in 1x1 meetings. If she has any concerns, she should contact CRO or HR and not be argumentative in 1 x 1 meeting. (7) Yiting should be on time and in person on days that the CTO EA team meets in person in the office. (8) Yiting should end all meetings on time. If she does not anticipate the discussion will be completed in time, she should plan, discuss next steps (such as scheduling a follow-up meeting) a few minutes before the meeting end time and end the meeting on time."

160.     HHSC, by and through Mr. Olekangal, engaged in a persistent pattern of severe and pervasive harassment as set forth herein, which created a hostile and offensive workplace environment in violation of Title VII.

161. Plaintiff was regularly and continually subjected to harassing unfavorable treatment and conduct alleged throughout this Complaint, which created a hostile and abusive working environment.

162. Defendant's unlawful conduct was unwelcome.

163. Plaintiff was subjected to harassment because of her national origin, race, color, and sex, and it unreasonably interfered and affected a term, condition, or privilege of Plaintiff's employment.

164. Defendant knew or should have known of the harassment. Defendant failed to adequately investigate the harassment and took no effective, immediate, or remedial action.

165. Despite Plaintiff's complaints, the harassment continued unabated and increased over time.

166. The claim of a hostile work environment exists when "the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Stewart v. Mississippi Transp. Comm'n*, 586 F.3d 321, 328 (5th Cir. 2009) (quoting *National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 116 (2002)). Plaintiff pleads such Defendant contributed to the abusive working environment.

167. By failing to take appropriate and effective remedial action against Plaintiff's supervisor, Defendant acted with malice or with reckless or callous indifference to Plaintiff's complaints.

168. Defendant is directly liable for the discriminatory acts or omissions of its agents, servants and employees while acting within the course and scope of their employment, under the theory of Respondeat Superior.

169.    As a direct and proximate cause of Defendant's conduct alleged throughout this Complaint, Plaintiff suffered and continues to suffer from harm, injury and monetary damages, and is entitled to all available legal and equitable remedies.

170.    Plaintiff was humiliated, embarrassed, and made to endure a great amount of pain and suffering. Further, Defendant's treatment and actions were ongoing.

## COUNT VI: RETALIATION BASED ON LEGALLY PROTECTED ACTIVITY UNDER TITLE XII

171.    Plaintiff incorporates all information and allegations contained in the preceding paragraphs as if fully set forth herein.

172.    Plaintiff is an employee within the meaning of Title VII.

173.    Defendant is an employer within the meaning of Title VII.

174.    Plaintiff engaged in protected activity by previously making discrimination complaints, and resolving her discrimination claims through a confidential agreement with Defendant.

175.    Plaintiff also engaged in protected activity when she complained on the following dates and received the following retaliatory adverse actions:

176.    First Protected Activity Complaint: On or about September 20, 2023, Ms. Liu verbally voiced her concerns of discrimination to Mr. Olekangal regarding the non-selection for Systems Analyst VII during a one-on-one meeting.

177.    Mr. Olekangal refused to respond to Ms. Liu's complaint, so Ms. Liu then reached out to Chief Technology Officer Wayne Vore ("Mr. Vore") and Deputy Chief Information Officer Cassie Jordan ("Ms. Jordan") to voice her complaints surrounding disparate treatment based on race, sex, color, and national origin.

178.    On or about September 21, 2023, Mr. Olekangal emailed Ms. Jordan and Mr. Vore requesting to remove Ms. Liu from Mr. Olekangal's team and to create 'new work rules' to apply only to Ms. Liu in an effort to micromanage her. Both requests were subsequently granted.

179.    Afterward, Mr. Olekangal refused to meet with Ms. Liu in one-on-one meetings and resorted to internal messages and emails.

180.    Liu subjected to Adverse Personnel Action: On October 4, 2023, Mr. Olekangal issued Ms. Liu a performance improvement plan ("PIP") filled with erroneous, false allegations of performance issues.

181.    Liu Makes Second Protected Activity Complaint: In response that same day on October 4, 2023, Ms. Liu filed an internal complaint with Civil Rights Office at HHSC against Mr. Olekangal regarding the PIP.

182.    The issues listed in her HHSC complaint described how the allegations supporting the PIP predated Ms. Liu's June 29, 2023 Annual Evaluation and her August 2022 evaluation, which did not reflect any of these allegations against her.

183.    Upon review of the PIP, Ms. Liu quickly realized that there were vague, ambiguous, and subjective issues that Mr. Olekangal was trying to point to in order to find that Ms. Liu incorrectly performed her job.

184.    Liu Makes Third Protected Activity Complaint: On November 5, 2023, Ms. Liu filed an additional complainant with HHSC Civil Rights Office to complain about the further issues with the PIP.

185.    Mr. Olekangal issued supplemental PIP allegations to Ms. Liu for poor performance on November 6, 2023.

186.     The allegations in the counseling document issued to Ms. Liu claimed further "Work Rule Violations" in furtherance of the PIP, and he maintained Ms. Liu was still not in compliance with the PIP.

187.     Ms. Liu filed her first EEOC Charge of Discrimination on January 19, 2024, complaining about the discrimination surrounding the non-selection of the Enterprise Architecture and Systems Analyst VII positions and the retaliatory performance improvement plan and counseling regarding allegations of violating work rules that were not HHSC-based rules.

188.     Liu Subjected to Third Adverse Personnel Action: Ms. Liu informed HHSC about an EEOC charge being filed on January 19, 2024. Afterwards, on January 25th, Mr. Heath falsely claimed that Ms. Liu did not obtain his authorization to provide volunteer 'Access Eligibility Services (AES)' work while he apologized for not being transparent about answering Ms. Liu's AES volunteer request to do the AES work.

189.     Liu Submits a Fourth Legally Protected Complaint with HHSC: Ms. Liu, that same day on February 9, 2024, reported the additional adverse actions to HHSC Civil Rights Office against Mr. Olekangal and Mr. Heath about the added allegations to the PIP issued to Ms. Liu.

190.     Liu Terminated from HHSC: On February 13, 2024, HHSC terminated Ms. Liu.

191.     On March 6, 2024, April 29, 2024, and May 1, 2024, HHSC gave false information to Texas Workforce Commission (TWC) to have Ms. Liu's unemployment payments denied.

192.     On May 25, 2024, Ms. Liu amended her charge and filed it with the EEOC, including her termination.

193. Ms. Liu updated her February 9, 2025 complaint with HHSC regarding her termination as retaliation for engaging in the preceding protected activities.

194. Defendant's retaliation occurred shortly after Plaintiff engaged in protected activity and shortly after Defendant's awareness of Plaintiff's protected activity. *See Porter v. Houma Terrebonne Hous. Auth. Bd. of Comm'rs*, 810 F.3d 940, 948–49 (5th Cir. 2015). This guidance is qualified, though: "[T]he protected act and the adverse employment action [must be] 'very close' in time." *Id.*

195. Defendant's actions constitute a violation of Title VII of the Civil Rights Act of 1964.

196. Due to Defendant's actions, Plaintiff has suffered, and continues to suffer, damages, including, but not limited to, emotional pain, suffering, mental anguish, and loss of enjoyment of life, and is entitled to all available legal and equitable remedies.

197. Defendant knew of Plaintiff's protected activities as Plaintiff had reported of the violations she discovered to Defendant, by and through its employees, including Mr. Olekangel, Wayne Vore, Pacian Heath and the Civil Rights Office of HHSC as stated above.

198. Plaintiff's protected activity was a determining factor in Defendant's unlawful conduct and termination toward Plaintiff.

199. The reasons proffered by Defendant for its unlawful conduct are pretextual and Defendant cannot further offer any legitimate reason for its unlawful conduct.

200. Defendant's aforementioned conduct has been intentional, deliberate, willful, malicious, reckless, and in callous disregard of the rights of Plaintiff because of her protected activity.

201.     Defendant subjected Plaintiff to the aforementioned adverse employment actions because of his participation and opposition to the unlawful and discriminatory employment practices of Defendant in violation of Title VII.

202.     Plaintiff was humiliated, embarrassed and made to endure a great amount of pain and suffering, and her injury is permanent in nature. Further, Defendant's treatment and actions were ongoing throughout the period stated in this complaint.

203.     Plaintiff has incurred loss of reputation and loss of career opportunities now and into the future, and all of the other losses stated without Plaintiff contributing in any way thereto.

## JURY TRIAL DEMANDED

204.     Plaintiff demands a trial by jury for all issues so triable.

WHEREFORE, Plaintiff respectfully prays that this Honorable Court order the award of monetary damages and equitable relief for all harm Plaintiff has sustained as a result of Defendant's unlawful conduct, including lost income of front and back pay, lost job benefits, loss of training and opportunity, prejudgment interest at the appropriate legal rate on all amounts awarded, compensatory damages and reasonable attorney fees from Defendant pursuant to 42 U.S.C. §2000e and any other applicable authority to be proven at the time of trial for all compensatory damages, and attorneys' fees and costs along with any other relief that this court finds reasonable under the circumstances, including interest after judgment at the appropriate legal rate on all amounts awarded until paid in full.

Dated: February 3, 2026                                    Respectfully Submitted,

*Paul B. Friener*
Managing Partner
SBN: 24100094
pfriener@tullylegal.com

*Nathan Simmons*
Associate
nsimmons@tullylegal.com

TULLY RINCKEY, PLLC
3420 Executive Center Drive Suite 160
Austin, Texas 78731
Tel: (832) 240-3273
Fax: (512) 225-2801